UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 AUG -7 PH 4: 13

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| PAULE EBRAHIMI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-95-S-1331-NE |
| | ) | |
| CITY OF HUNTSVILLE BOARD | ) | |
| OF EDUCATION, MARTHA | ) | |
| MILLER, ANN FEE, RANDY | ) | ENTERED |
| BOUNDS, JAMES DAWSON, RON | ) | |
| SAUNDERS, and MARY RUTH | ) | AUG 7 2000 |
| YATES, in their individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff, Paule Ebrahimi, was appointed principal of McDonnell Elementary School ("McDonnell") in Huntsville, Alabama, during 1991. McDonnell is a component of the Huntsville City School System ("school system"). Three years after plaintiff's appointment, the City of Huntsville Board of Education ("Board") approved the recommendation of school system Superintendent Ron Saunders to suspend plaintiff with pay. A month later, the Board approved Saunders' recommendation to transfer plaintiff to a position in the school system's central office. Plaintiff protested the suspension and transfer internally, and then commenced this action.

Plaintiff's original complaint was brought against fifteen

defendants:  the Board as an entity; four members of the Board in their official and individual capacities (Martha Miller, Ann Fee, Randy Bounds, and James Dawson); one member of the Board in her official capacity only (Jenny Jacks); Superintendent Saunders in his official and individual capacity; the school system's Assistant Superintendent (Mary Ruth Yates) in her official and individual capacity; the Director of the Huntsville Education Association (Rex Cheatham) in his official and individual capacity; the President of the Huntsville Education Association (Patsy Parker) in her official and individual capacity; and, several McDonnell teachers (Lori Dalton, Judy Guin, Billie Crick, Jan Hamilton, and Jane Adams) in their official and individual capacities.  Plaintiff advanced claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII"), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), 42 U.S.C. §§ 1983 and 1985, and Alabama law.  Plaintiff amended her complaint on September 5, 1995 (Doc. No. 24) to add a claim under 42 U.S.C. § 1981 against all defendants, and, to extend her 42 U.S.C. § 1985 claim to certain defendants.

Plaintiff's case originally was assigned to United States

2

District Judge James Hughes Hancock.  By way of three separate orders (Doc. Nos. 30, 36, & 43), Judge Hancock pared plaintiff's theories of liability to Title VII, Title IX, and § 1983 (equal protection) claims against the Board, and § 1983 (equal protection) claims against Miller, Fee, Bounds, Dawson, Saunders, and Yates in their individual capacities.  All other defendants, as well as the official capacity claims against the remaining individual defendants, were dismissed.[1]  (Because Board member Jenny Jacks was sued only in her official capacity, all claims against her have been dismissed, and she is no longer a party to this lawsuit.)  The case subsequently was reassigned to this court.

The action presently is before the court on a motion for summary judgment (Doc. No. 88) filed by the remaining defendants. They seek to dismiss all of plaintiff's remaining claims. Defendants filed a brief (Doc. No. 94) and evidentiary submission (Doc. No. 91) in support of summary judgment.  Plaintiff filed a brief (Doc. No. 100) and evidentiary submissions (Doc. Nos. 97 (under seal) & 98) in opposition to summary judgment.  The parties

---

[1] Judge Hancock certified the dismissal of plaintiff's claims as a partial final judgment pursuant to Federal Rule of Civil Procedure 54(b). Plaintiff timely filed a notice of appeal regarding Judge Hancock's dismissal of her §§ 1981 and 1985 claims.  The Eleventh Circuit held that Judge Hancock abused his discretion by utilizing Rule 54(b) certification.  While not "commenting on the substance" of Judge Hancock's decisions, the Eleventh Circuit dismissed the appeal for want of jurisdiction.  *See Ebrahimi v. City of Huntsville Board of Education*, 114 F.3d 162, 165, 168 (11th Cir. 1997).

exchanged supplemental briefs (Doc. Nos. 108 & 109) as well.  In an
order entered April 16, 1999 (Doc. No. 122), the court ordered the
parties to address plaintiff's "pattern or practice" theory of
disparate treatment under Title VII.  Plaintiff submitted her brief
on April 30, 1999 (Doc. No. 123), and defendants on May 17, 1999
(Doc. No. 127).[2]  In an order entered on August 19, 1999 (Doc. No.
144), the court stayed this action pending the Eleventh Circuit's
*en banc* reconsideration of the panel decision in *McAndrew v.*
*Lockheed Martin Corporation*, 177 F.3d 1310 (11th Cir. 1999).  The
*McAndrew* panel opinion conflicted with prior circuit precedent,
*Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1977),[3] and had a
direct impact on the viability of plaintiff's 42 U.S.C. § 1985
claims, which had been dismissed by Judge Hancock.  The Eleventh
Circuit rendered its *en banc* decision on March 8, 2000.  *McAndrew*
*v. Lockheed Martin Corporation*, 206 F.3d 1031 (11th Cir. 2000).
Accordingly, defendants' motion for summary judgment now is ripe
for adjudication.

---

[2] Plaintiff's motion to supplement her surreply brief (Doc. No. 112) is due
to be granted.  Her motion for leave to reply to defendants' "pattern or
practice" brief (Doc. No. 128) is due to be denied.

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en*
*banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit
decisions handed down prior to the close of business on September 30, 1981.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.*; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th

Cir. 1995) (*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d at 593.  The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor.  *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Inferences in favor of the non-movant are not unqualified, however.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537

6

(11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With those standards in mind, the following material facts either are not disputed or, if disputed, are stated in the light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

### A.   The Parties

Plaintiff, a female, is a native of Haiti, a country of the West Indies on the western part of the island of Hispanolia.  She was born in its capital, the city of Port-au-Prince, during 1951.  She describes herself as a "Black Haitian Mulatto," because "part of [her] heritage ... is White."[4]  Plaintiff is an adherent of Baháism, a religion founded in Iran that emphasizes the spiritual unity of all humankind.[5]

The Board first employed plaintiff in 1986, as a special education resource teacher at the Academy for Academics and Arts, a so-called "magnet school."  Plaintiff held that position until 1988, when she accepted the position of specialist coordinator.  As noted *supra*, plaintiff became principal of McDonnell in 1991.  Saunders' predecessor as Superintendent, Mary Jane Caylor, recommended plaintiff to the Board for appointment to that position.  Saunders served as Superintendent from October of 1991

---

[4] Plaintiff's deposition (Volume I) at 99, attached as Exhibit H to defendants' evidentiary submission in support of summary judgment.  Volume I of plaintiff's deposition also is attached as Exhibit 1 to plaintiff's evidentiary submission in opposition to summary judgment.

[5] *See id.* at 17.  *See generally* Webster's New International Dictionary 163 (1966) (defining "baháism" as "the doctrine and practice of a sect founded in Iran in the 19th century that emphasizes the spiritual unity of mankind, advocates world peace and universal education, and affirms the equality of men and women").

to February of 1998.  Mary Ruth Yates has served intermittently as Assistant Superintendent for Instruction since June of 1993.

The Board has five members, who are elected from single-member districts and serve staggered terms.  The members of the Board during the period relevant to this suit were Randy Bounds, James Dawson, Ann Fee, Jenny Jacks, and Martha Miller.  The Board appoints a Superintendent, who is charged with the duty to "nominate in writing for appointment by the city board of education all principals ... and shall assign to them their positions, transfer them as the needs of the schools require, recommend them for promotion, suspend them for cause and recommend them for dismissal ...." Alabama Code § 16-12-16 (1975).  The Board, as the final decision-making authority, "may suspend or dismiss any principal ... on the written recommendation of the city superintendent of schools ... when, in the opinion of the board, the best interests of the schools may require." *Id.* § 16-11-17. "In personnel matters, under Alabama law, the Board may only vote yes or no on the Superintendent's recommendation.  Also, under Alabama law, no motion or resolution before the Board may be declared adopted without the affirmative vote of the majority of the whole Board."[6]

---

[6] Ron Saunders affidavit ¶ 2, attached as Exhibit A to defendants'

9

## B.    Pre-Transfer Facts

Plaintiff's first two years at McDonnell outwardly appeared to be successful.  Among other accomplishments, she implemented novel approaches to student discipline, created a school handbook, developed relationships with "business partners" who donated funds for the procurement of needed equipment, created a parenting program, and increased PTA membership.  Even so, questions concerning plaintiff percolated within the McDonnell faculty and staff:

> Q.    Was there anything that occurred in the '91-'92 school year that you felt was discriminatory on the basis of race, sex or religion?

> A.    The only thing in that light was the constant questioning of who I was by faculty members.  What is she?  Does she know her identity?  How is she going to lead the school and the children if she doesn't know who she [i]s?  Why did her children have such strange names? And did I come from one of those islands?

> . . .

> Q.    Did you know of any ... comments by [janitor Ronnie] Flippo during the '91-'92 school year?

> A.    Not the specifics.  The doubting.  Because he would even say things to me, where are you from Mrs. E. You know, that kind of thing.

> Q.    And what would you say?

> A.    Where do you think I come from.  And I would

---

evidentiary submission in support of summary judgment.

> tell him from Haiti and he would make comments like where
> they play voodoo drums and I'd say yeah.
>
> Q.   Did you ever admonish Mr. Flippo that you
> considered this racist?
>
> A.   No, I didn't.
>
> ...
>
> Q.   So you felt you had a good relationship with
> him notwithstanding those comments?
>
> A.   Right.  I excused his ignorance or tolerated it
> because I knew of his level of education.[7]

Some faculty members expressed concern that plaintiff, pursuant to

her religious beliefs, did not celebrate Christmas.  Plaintiff

suggested that the teachers not focus so much on one faith during

the holiday season, because McDonnell students came from different

religious backgrounds.

Saunders was so impressed by plaintiff's accomplishments that

he nominated her as "principal of the year" for the 1992-93 term,

only to later revoke the nomination because she had not accumulated

sufficient time in the position to merit consideration.  In his

1993 evaluation, Saunders remarked that plaintiff had made a lot of

progress at McDonnell, and was professional, caring, and

enthusiastic.

Plaintiff solicited an evaluation of her performance from the

---

[7] Plaintiff's deposition (Volume I) at 81, 87, 88.

McDonnell faculty during the spring of 1993.  Certain responses to that questionnaire foreshadowed future problems between plaintiff and her subordinates.  Of 22 teachers who responded, at least 10, a significant minority (45+%), disagreed with each of the following statements:  problems and conflicts are approached positively in this school; the principal handles conflicts among staff members in a professional and helpful manner; the principal does not demonstrate favoritism toward any member of the staff; all teachers feel they count in this school; the principal treats all teachers professionally; the principal refrains from making unprofessional or inappropriate statements to members of the staff; the principal is accessible to discuss matters dealing with instruction; a positive feeling toward the principal permeates the school; a "we" spirit exists in the school; and finally, teachers look forward to coming to work.[8]

A number of McDonnell employees, including Trisha Harper, Stephanie Stimac-Uss, and Deborah Jordan, observed incidents with discriminatory undercurrents at the school.  Harper stated that one teacher questioned plaintiff's intelligence based on the fact that she was "black," and further remarked that plaintiff was "not even

---

[8] *See* Exhibit 2 to Volume I of plaintiff's deposition.

a Christian."[9]   Harper also noted that certain teachers were extremely rude to plaintiff, but very polite and deferential to plaintiff's white business partners.   Both Harper and Stimac-Uss stated that certain teachers mistreated black students, or made derogatory comments to them.

Assistant Superintendent Yates informed plaintiff that Sharon Anderson, a computer aide at McDonnell, had told some parents of McDonnell students that plaintiff frequently prayed to a picture of Saddam Hussein.   Plaintiff dismissed the claim as ridiculous, because "if [Anderson and the parents] only knew their geography [they would know that] Saddam Hussein persecutes Bah[á]i."[10]   The claim was never investigated by the Board, Saunders, or Yates.

In hindsight, it appears the catalytic event that precipitated the explosive events leading to this action occurred during October of 1993.   Plaintiff placed a letter of reprimand in the file of Judy Guin, a McDonnell teacher, for using alcohol on school property.   Plaintiff had detected alcohol on Guin's breath on a number of occasions since the spring of 1993.   When plaintiff was out-of-town later that month, her secretary, Pat Peoples, permitted Guin to use plaintiff's office.   Plaintiff, upon returning to

---

[9] Trisha Harper deposition at 39-40, 69, attached as Exhibit 12 to plaintiff's evidentiary submission in opposition to summary judgment.

[10] Plaintiff's deposition (Volume I) at 198.

13

McDonnell, observed that numerous files were missing from her computer's hard drive.   Plaintiff reprimanded Peoples for permitting others to use her office.

On October 29, 1993, Saunders received a letter from "Concerned Members of the McDonnell School Staff."  That letter, eventually signed by a substantial number of the McDonnell staff (24 persons), critically challenged plaintiff's administrative skills:

> Our decline in morale is directly related to the lack of professionalism shown by Mrs. Ebrahimi.  She has shown her administrative tactic to be one of "divide and conquer" rather than to encourage and promote unity. Blatant favoritism is evident, tattling is encouraged, and hearsay is accepted as truth.  This is unacceptable behavior for teachers and should be for administrators as well.
>
> Instead of using her position to constructively criticize the faculty, our administrator uses it to degrade and intimidate.  This has created within many teachers a loss of self-esteem, a sense of uncertainty in regards to what is expected, a feeling of questionable integrity and professionalism, and unfortunately a decreased enthusiasm for teaching.  We have often felt personally and professionally threatened.
>
> It is very disconcerting and depressing to stand idly by as co-workers are singled out, degraded, humiliated, harassed, and embarrassed both privately and publicly. As a result, we are, as one faculty member stated, "gripped with fear" whenever we encounter Mrs. Ebrahimi. Is this the best atmosphere for educating our young children? [11]

---

[11] Exhibit 3 to Volume I of plaintiff's deposition.

The staff members concluded that "something must be done to improve these conditions in order to provide the best education for our children."[12]   The staff members supplemented their submission on November 3, 1993, with a documentation of specific instances of alleged misconduct by plaintiff.[13]

Saunders and Yates met with plaintiff to discuss the complaints on November 5, 1993.   During that meeting, Saunders expressed an opinion concerning the sociocultural differences that might have motivated the complaining staff members.   Plaintiff later recounted that Saunders opined:

> [I]t's probably the way you are, the way you look, you're
> [from] a different culture, you're from a different part
> of the country.   You grew up in the north, you weren't
> even born in this country.   You're not from the South,
> you're not a Baptist.   And besides that you're not a
> Christian.   You're a Bah[á]i, you're married to a
> foreigner and your kids are mixed.   Something to that
> [e]ffect.[14]

Yates added that the staff members likely were threatened by plaintiff's intelligence, knowledge of her field, and mode of dress.[15]

---

[12] *Id.*

[13] *See* Exhibit 4 to Volume I of plaintiff's deposition.

[14] Plaintiff's deposition (Volume I) at 138.

[15] *See id.* at 139-40 ("And that I could have been a threat to them because I seemed knowledgeable about my field.   I was intelligent.   Somehow my dress -- maybe the way I dress probably threatened them.").

15

Plaintiff drafted a letter to Saunders on November 15, 1993, addressing the contentions of the McDonnell staff.  She emphasized the subjective nature of their complaints by noting that "[n]o charges of violations, no policy broken, no harm imposed on the authors of this letter exists nor are any stated."[16]  Further, she systematically addressed each of the staff's documented incidents of alleged misconduct.  Saunders responded to plaintiff's letter on November 19, 1993, suggesting that she strive to improve her interpersonal communication techniques and involve all teachers in the betterment of McDonnell.[17]  Plaintiff thanked Saunders for his letter on November 22nd, and pledged to make good on his suggestions for improvement.[18]

On November 24, 1993, Saunders visited McDonnell and addressed the faculty and staff.[19]  He encouraged both factions to work hard at a proper resolution of the conflict.  Additionally, Saunders pledged to have "monitors" visit McDonnell on a daily basis.  To that end, he assigned Rachel Cervantes and Arthur Booker, acting head of the K-12 curriculum for the school system, to McDonnell.

---

[16] Exhibit 5 to Volume I of plaintiff's deposition, at 2.

[17] *See* Exhibit 9 to Volume I of plaintiff's deposition.

[18] *See* Exhibit G-8 to transcript of plaintiff's March 24, 1994 transfer hearing, attached as Exhibit G to defendants' evidentiary submission in support of summary judgment.

[19] *See* Exhibit 11 to Volume I of plaintiff's deposition.

While Cervantes only visited McDonnell on a couple of occasions, Booker spent a considerable amount of time there during the month of December.  According to plaintiff, Booker never told her that the situation was unresolvable; on the contrary, Booker told her he was encouraged by what he observed.  Harper and Stimac-Uss, however, charged that Booker avoided them, and failed to respond to their claim that the teachers, not plaintiff, were causing the problems.

Assistant Superintendent Yates also visited McDonnell, and met with faculty and staff outside of plaintiff's presence on certain occasions.  When Yates did talk with plaintiff, she suggested that a possible solution to the problem would be to transfer those faculty and staff members who were viewed as instigators of the complaints — Lori Dalton, Billie Crick, Jan Hamilton, Jane Hanson, and Sharon Anderson.  Yates also remarked to plaintiff that Saunders' retention of his position as Superintendent was in jeopardy, because of what was transpiring at McDonnell.

Plaintiff attended a meeting with the McDonnell faculty, Superintendent Saunders, Assistant Superintendent Yates, and Cervantes at the end of November.  The meeting was quite contentious, with teachers standing and yelling at plaintiff. According to Angela Carr, a faculty member who supported plaintiff,

17

neither Saunders nor Yates did anything to bring decorum to the meeting.  Once plaintiff's supporters were permitted to speak, they informed Saunders and Yates that the allegations against her were untrue, and that the substance of the meeting should be kept confidential.   Plaintiff's opponents refused to keep matters confidential, however.

Saunders and Yates later told plaintiff that her handling of Judy Guin's alleged alcohol problem had sparked the controversy, because Guin was a good friend of Board member Martha Miller. Yates and Saunders recommended that plaintiff remove the written reprimand from Guin's file, and then meet with Billie Crick (one of the protesting teachers) to explore means of harmoniously resolving the faculty discord.   Crick refused to meet with plaintiff, however.

Yates told plaintiff she needed to voluntarily transfer from McDonnell, saying her failure to do so would ultimately cost Saunders his job. Plaintiff stated in deposition that Saunders, in the presence of Yates, told her that if she voluntarily transferred from McDonnell, she could eventually assume any of the following positions: principal of Hampton Cove Elementary School; K-12 Curriculum Director; Director of Federal Programs; Director of Research and Development; Director of Technology; or Director of

18

Program Assessment and Research.   In deposition, Saunders reiterated his belief that plaintiff, by accepting a short-term transfer to the school system's central office, "could prove herself again to be a competent administrator," and be a "top candidate" for an opening principalship at a place like Hampton Cove.[20]  Plaintiff refused to voluntarily transfer, however.

Saunders again wrote to plaintiff on November 30, 1993.  He reiterated his support of her, but the letter contained more than a hint of dejection:

> I do not know if there is a win/win situation down the road on this for either you or me.  It is unfortunate because I truly believe we are in the right.
>
> I think you need to assess the situation over the next few weeks and determine if it is working and worth the fight.  I know you will be more productive if you are happy and not looking over your shoulder to see who is on your back.  If indeed you wish to come out of McDonnell, it would have been on your terms.  I will support you either way.  However, I too am discouraged with the reaction of the media, HEA, and especially the Board of Education.
>
> . . .
>
> Some people do not realize that even if you are no longer at McDonnell Elem. the same problems will remain, only swept under the rug.  Where we are headed in Education, I do not know.  And are educators like you and me the ones that will be sacrificial lambs?[21]

---

[20] Ron Saunders deposition (Volume I) at 248-49, attached as Exhibit 4 to plaintiff's evidentiary submission in opposition to summary judgment.

[21] Exhibit Q to plaintiff's affidavit, attached as Exhibit 16 to

Saunders recommended mediation between plaintiff and the concerned staff members, but the staff members refused to participate.

In the middle of December, plaintiff initiated contacts with Board members Fee, Dawson, and Bounds, seeking their support. Fee was noncommital in response to plaintiff's plea for assistance, but expressed anger over the fact that her name had been included in the documented incidents of misconduct originally submitted by the concerned staff members.[22] Plaintiff described Dawson and Bounds as "evasive."

In the meantime, two other teachers who supported plaintiff,

---

plaintiff's evidentiary submission in opposition to summary judgment.

[22] The staff members mentioned Fee in an incident dated October 18, 1993:

> Mary Paige McElroy [a McDonnell teacher] was called into Mrs. Ebrahimi's office. She was told that during the School Board's visit on the previous Friday, Ann Fee had been distraught over the amount of paper work being done by the children. Some of the children didn't know what they were doing - there was one in particular that missed most of a beginning sounds worksheet. Mrs. McElroy informed the principal that the class was working on ending sounds, could a mistake have been made by the observer. Mrs. Ebrahimi further stated, "No - whatever, it was, the child didn't understand." Then it was said that she wouldn't say anything to M.P. McElroy normally but a Board Member had said something to her and she felt it important to let Mrs. McElroy know. This upset Mrs. McElroy and made her feel professionally threaten[ed] by the statement. ... A week later, Mrs. McElroy contacted Mrs. Ann Fee to invite her to come in and visit her class anytime for a lengthy visit. Mrs. McElroy then indicated to Mrs. Fee the conversation that had taken place between herself and the administrator. Although Mrs. Fee didn't deny saying these things, she seemed truly surprised and stated, "I was in the classroom for 30 years. I would never think anything like that."

Exhibit 4 to Volume I of plaintiff's deposition, at unnumbered page 4.

20

Deborah Jordan and Debra Glaza, told Yates that racial and/or gender bias was motivating the conflict. Judy Buck, another principal, informed Board members that plaintiff was being mistreated because of her race, sex, and religion. Finally, Trisha Harper and others told Saunders that the problems stemmed from plaintiff's race.

The "concerned staff members" submitted a supplemental list of complaints to Saunders on December 21, 1993.[23] Plaintiff again responded to those complaints by a letter dated December 29, 1993.[24] Based on Saunders' communications with members of the Board around this same time, however, he had become convinced that plaintiff could not retain her principalship at McDonnell. He told plaintiff the Board had made up its mind that she needed to be removed. Saunders also remarked that she had suffered some "bad luck," because Dawson's wife was good friends with some of the protesting teachers, Miller and Guin were good friends, and Fee was upset at having been mentioned in the allegations of misconduct.

Accordingly, on January 3, 1994, Saunders informed plaintiff that she had three options: she could remain at McDonnell as a

_____

[23] *See* Exhibit 13 to Volume II of plaintiff's deposition, attached as Exhibit 2 to plaintiff's evidentiary submission in opposition to summary judgment. Volume II of plaintiff's deposition is also denominated as Exhibit I to defendants' evidentiary submission in support of summary judgment.

[24] *See* Exhibit 14 to Volume II of plaintiff's deposition.

21

"dummy" principal, with no job duties; she could voluntarily transfer to the school system's central office, and work in the Curriculum Department; or she could be suspended with pay for the remainder of the 1993-94 school year.   In affidavit, Saunders stated that he posed the three options to plaintiff at this point, because "[s]omething had to be done immediately to let the children learn.  Either 24 employees or one principal had to be removed from the situation."[25]   Plaintiff rejected the first two options.

Saunders wrote to plaintiff on January 5, 1994, informing her that he had decided to suspend her with pay:

> In my judgment it is in the best interest of McDonnell Elementary School that you be suspended with pay, pending Board approval at its meeting on January 6, 1994.  You are, therefore, suspended with pay effective immediately.
>
> With Board approval, I will appoint someone else to assume your duties as principal of McDonnell Elementary. [26]

The Board approved Saunders' recommendation to suspend plaintiff with pay.   Saunders eventually recommended to the Board that it transfer plaintiff to the position of Curriculum Technologist (K-6) in the school system's central office, with her job duties beginning at the start of the next school year.   The Board approved

---

[25] Saunders affidavit ¶ 9.

[26] Exhibit G-11 to transcript of plaintiff's March 24, 1994 transfer hearing.

22

that recommendation on February 3, 1994.   Reasons cited for the transfer included:   plaintiff's conflicts with teachers and her tendency to attack integrity and credibility; plaintiff's method of chastising and reprimanding teachers inappropriately, and in the presence of other teachers and students; plaintiff's habit of talking negatively about other teachers; plaintiff's inappropriate reaction to allegations without getting the facts; plaintiff's harsh, angry, and tempestuous demeanor; and her favoritism toward certain teachers.[27]

Plaintiff requested, and was granted, a hearing on the proposed transfer.   That occurred on March 24, 1994.   Saunders and plaintiff were both represented by counsel, and presented witnesses in favor of and opposition to the transfer decision.   The Board reiterated its support of the transfer decision after the hearing. Plaintiff appealed the Board's decision to the Alabama Tenure Commission, which sustained the decision.

## C.   Post-Transfer Facts

Nell Skidmore, a white female, replaced plaintiff at McDonnell on an interim basis.   Linda Winters, another white female, eventually assumed the principalship in a permanent capacity.

---

[27] *See* Exhibit G-1 to transcript of plaintiff's March 24, 1994 transfer hearing.

Plaintiff completed and signed a charge of discrimination on March 12, 1994, which was received by the EEOC on April 6, 1994.   It alleged plaintiff's suspension and impinding transfer were unlawfully based on her race, religion, and sex.[28]

Plaintiff assumed the position of Curriculum Technologist in the fall of 1994.   While the pay and benefits associated with that position were equivalent to those plaintiff had earned as Principal, she considered the transfer a demotion.   Plaintiff claims she lost status, because she was no longer a principal. Further, she stated in deposition that the Curriculum Technologist position had "no real responsibility."[29]

Plaintiff, to no avail, applied for several other school system positions after filing her EEOC charge.   She sought to become the Manager of Elementary Education, but that position was never filled.   Plaintiff also applied for numerous principalships, but was turned away each time.   The schools she expressed interest in heading included:  Hampton Cove (position given to white male); Colonial Hills (position given to black male); Highlands (position given to white female); West Mastin Lake (position given to black female);  and Ridgecrest (position re-advertised after plaintiff

---

[28] *See* Exhibit T to defendants' evidentiary submission in support of summary judgment.

[29] Plaintiff's deposition (Volume II) at 21.

24

applied).

Plaintiff's initial supervisor at the central office was Arthur Booker. Booker was supervised by Yates. Sally Hershberger, the Director of Research and Development, supervised plaintiff beginning in June of 1995. In affidavit, plaintiff recounted numerous difficulties that she experienced while serving as a Curriculum Technologist, including: delay in obtaining permission to attend an International Reading Conference (¶ 7 of plaintiff's affidavit); denial of permission to attend an internet conference, with an accompanying letter of reprimand issued by Hershberger (¶ 8); denial of personal leave (¶ 9); permission to attend only one principals' meeting (¶ 11); denial of permission to work with teachers in developing math and science assessments, despite the fact plaintiff had training in that capacity (¶ 13); exclusion from meetings regarding procurement of science textbooks, despite the fact that plaintiff coordinated the "Hands-On Science" program (¶ 14); exclusion from curriculum meetings and training (¶ 15); restriction on input regarding certain projects, including the Language Arts Curriculum Scope and Sequence and the Science Scope and Sequence (¶¶ 16-17); not being permitted to fulfill duties of job description, including "consult[ing] with teachers and principals on ways to improve classroom instruction" (¶¶ 18-19);

denial of permission to conduct certain types of training (¶¶ 22-23); difficulty in coordinating the ordering of reading chart stands for teachers (¶ 24); canceling of a practicum program, which interfered with plaintiff's efforts at obtaining her Education Specialist degree from the University of Alabama (¶ 25); not being informed of grants procured by the Research and Development department (¶ 27); receipt of "harsh and derisive" memoranda from Hershberger (¶ 28); Hershberger's failure to address plaintiff's computer and software needs (¶ 29); delay in receiving approval to act as project coordinator for African American Historic Project Grant (¶ 30); Yates' mischaracterization of plaintiff's testimony at a transfer hearing for another Principal, Judy Buck (¶ 32); upper management's lack of support for the Teachers Networking with Teachers Committee (¶ 33); Hershberger's delay in responding to plaintiff's statement of training needs for the "Hands on Science" project (¶ 34); receiving a reprimand from Saunders relating to a breach of student testing security (¶ 35); denial of permission to attend an "English as a Second Language" workshop (¶ 38); and being required to serve as the only employee answering the telephone during the first day of system-wide testing (¶ 39).

Plaintiff filed an internal grievance on April 25, 1996, relating to a number of the events described in the preceding

paragraph.[30]  Saunders responded to her grievance on April 29, 1996, saying that he was unaware of "any retaliation against you for anything," and further commenting that "[d]espite your obvious angry demeanor and tone at work, every effort has been made to treat you as all others are treated."[31]  Plaintiff resigned her position as Curriculum Technologist on May 14, 1997, stating that "[c]onditions of employment have become so unbearable that I find it necessary to leave."[32]

## III. DISCUSSION

### A.   Introduction

As summarized at the beginning of this opinion, plaintiff's remaining causes of action include Title VII, Title IX, and § 1983 claims against the Board, and § 1983 claims against Miller, Fee, Bounds, Dawson, Saunders, and Yates in their individual capacities.[33]  Under the rubric of Title VII, plaintiff alleges

---

[30]  *See* Exhibit R to plaintiff's affidavit.

[31]  *Id.*

[32]  Exhibit P to plaintiff's affidavit.

[33]  42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be

disparate treatment based on the Board's decision to suspend and transfer her, retaliation after the filing of her EEOC charge of discrimination, and exposure to a hostile work environment. The Title VII claims implicate plaintiff's race, religion, and sex. The § 1983 claims are premised on the equal protection clause of the Fourteenth Amendment to the United States Constitution.

**B.    Title IX Claims Against the Board**

The court addresses plaintiff's Title IX claims against the Board as an initial matter. Plaintiff's evidentiary submissions and briefs make clear that her Title VII, Title IX, and § 1983 claims arise out of a common core of operative facts. Another district court in this circuit has dismissed a plaintiff's Title IX claims for disparate treatment, retaliation, and hostile work environment, because they were duplicative of her Title VII claims. *See Blalock v. Dale County Board of Education*, 84 F. Supp. 2d 1291, 1298-1300 (M.D. Ala. 1999). That court relied on the Fifth Circuit's decisions in *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995), and *Lowrey v. Texas A&M University System*, 117 F.3d 242 (5th

---

granted unless a declaratory decree was violated or declaratory relief was unavailable. ... [footnote continued]

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citations and internal quotation marks omitted).

Cir. 1997), when concluding that dismissal was warranted.

This court finds merit in the *Blalock* court's analysis, and concludes that plaintiff's Title IX claims premised on disparate treatment, retaliation, and hostile work environment are likewise due to be dismissed against the Board, as duplicative and unnecessary.

**C.    Title VII and § 1983 Claims Against the Board**

    **1.    Disparate treatment**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e-2(a).  The Supreme Court articulated the theory undergirding disparate treatment claims in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

> The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.  Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

*Id*. at 335-36 n.15, 97 S.Ct. at 1854-55 n.15.

Plaintiff seeks to establish her claim of disparate treatment through two forms of proof.  First, she contends the Board should be held liable based on its "pattern or practice" of race discrimination.  *See generally Franks v. Bowman Transportation Company*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).  Second, plaintiff argues that she has proffered sufficient circumstantial evidence of unlawful discrimination to establish a claim of disparate treatment.[34]  *See generally McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  The court addresses the applicability and adequacy of those methods of proof below.

### a.   "Pattern or Practice"

In the typical "pattern or practice" case, a large number of plaintiffs rely on a combination of statistical and anecdotal evidence demonstrating a defendant-employer's "standard operating procedure" to be one of discrimination based on a protected characteristic.  If plaintiffs are able to make that showing, a presumption of discrimination is established, which the defendant

---

[34] A plaintiff may also prove disparate treatment through an offer of direct evidence or statistical evidence.  Only the most blatant remarks demonstrating a discriminatory animus are deemed to constitute direct evidence.  *See generally* Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999); Wright v. Southland Corporation, 187 F.3d 1287, 1293-1303 (11th Cir. 1999).  A review of the record in this case demonstrates that plaintiff has not adduced direct or statistical evidence to support her claims of race, sex, or religious discrimination.

may rebut only through an offer of clear and convincing evidence
that it acted in a lawful manner.

> In a pattern and practice case, if the plaintiff can
> establish "that ... discrimination [based on a protected
> characteristic] was the company's standard operating
> procedure," ... the burden shifts to the employer to
> prove that the plaintiff was not, in fact, the victim of
> discrimination. ... In other words, once a pattern and
> practice of discrimination is established, a rebuttable
> presumption that plaintiff was discriminated against
> because of [the protected characteristic] and is entitled
> to recovery obtains.  The employer may overcome this
> presumption only with clear and convincing evidence that
> job decisions made when the discriminatory policy was in
> force were not made in pursuit of that policy.

*Cox v. American Cast Iron Pipe Company*, 784 F.2d 1546, 1559 (11th

Cir. 1986).  A comparison of the burden-shifting framework and

evidentiary standards employed in "pattern or practice" cases to

that utilized in *McDonnell Douglas*, circumstantial evidence cases

(discussed *infra* Section III.C.1.b) will demonstrate why plaintiff

has attempted to turn her disparate treatment claim into a "pattern

or practice" case.

The rub lies in the fact that "[p]attern-or-practice suits, by

their very nature, involve claims of classwide discrimination.

Such claims involve an allegation that the defendant's actions

constitute a pattern of conduct in which the defendant

intentionally has discriminated against the plaintiff's protected

31

class."   I   Barbara   Lindemann   &   Paul   Grossman,   *Employment Discrimination Law* 44 n.168 (3d ed. 1996).   *See also Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000) (noting that "[p]roving a pattern or practice is necessary to establishing a prima facie case in a disparate treatment class action"); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 759 (4th Cir. 1998) ("We agree with [defendant] that individuals do not have a private, non-class cause of action for pattern or practice discrimination under § 1981 or Title VII."), *vacated on other grounds*, ___ U.S. ___, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *Babrocky v. Jewel Food Company*, 773 F.2d 857, 866 n.6 (7th Cir. 1985) (observing that "pattern or practice" theory "seems to be misplaced" in individual lawsuit alleging disparate treatment); *Anderson v. Twitchell-A Tyco International Limited Company*, 76 F. Supp. 2d 1279, 1292 (M.D. Ala. 1999) ("In other words, a pattern and practice claim is not a separate cause of action available to a private, individual plaintiff that would alleviate the need to prove individual discrimination under the *McDonnell Douglas* framework.").

The Eleventh Circuit's opinion in *Cox* does not aid plaintiff in her assertion that she can make out an individual case of disparate treatment through "pattern or practice" evidence.   *Cox*

began as a class action on behalf of all past, existing, and future female employees of the American Cast Iron Pipe Company.   The plaintiffs challenged defendant's policy of reserving higher-paying job positions for men.   The first of three district judges who handled the case over the course of its more than ten-year history certified that the action was maintainable as a "hybrid" Rule 23(b) class of some 240 plaintiffs.   The second judge denied defendant's motion for decertification.   The third judge, however, decertified the class, and tried the case as if it had been brought by 21 individual plaintiffs.   While the procedural history of *Cox* may be complex, the Eleventh Circuit's holding is not.   The *Cox* court held that the district court erred by decertifying the class and solely applying the *McDonnell Douglas* analytical framework to plaintiffs' class disparate treatment claims:

> We are conscious that [touchstone "pattern or practice" cases] *Teamsters* [*v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)] and *Franks* [*v. Bowman Transportation Company*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)] involved large classes rather than individual plaintiffs.  <u>But the plaintiffs here are not, as in *McDonnell Douglas*, simply "individual complainant[s] seeking to prove one instance of unlawful discrimination.</u>"

*Cox*, 784 F.2d at 1559 (citations omitted) (emphasis supplied).   The Eleventh Circuit remanded the case "for retrial as a pattern and

33

practice <u>class action</u>."  *Id*. at 1549 (emphasis supplied).

The emphasized portions of the preceding quotes from the *Cox* opinion indicates that a "pattern or practice" mode of proof is not appropriate here:  an action brought by an individual plaintiff to challenge what amounts to one prolonged instance of alleged unlawful discrimination.  Rather, the traditional *McDonnell Douglas* approach to analyzing circumstantial evidence of discrimination, discussed *infra* in Section III.C.1.b, is immediately relevant.

### i.  "me too" evidence

As a corollary to plaintiff's "pattern or practice" argument, she references the situations faced by other African-American female principals and candidates for principalships within the defendant school system — notably Evalyn Humphrey, Judy Buck, and Shirley Hughes — to support her claim of disparate treatment. Humphrey was involuntarily transferred from her principalship at Johnson High School, because Saunders felt such a transfer to be in the best interest of the school system.  The Board approved Saunders' recommendation, and Humphrey did not request a transfer hearing.  Saunders recommended that Buck be transferred from her principalship at Challenger Middle School, but the Board did not adopt that recommendation.  Buck ultimately was transferred to

34

another school within the system.   She did not request a hearing relating to that decision, but did commence her own lawsuit in federal district court.[35]   Hughes applied and interviewed for the Principal position at Westlawn, but was not appointed.

All of the preceding individuals, like plaintiff, believed they suffered adverse employment actions at the hands of Saunders and the Board because of their race and gender.   Through an offer of such evidence, plaintiff pursues the following theory of discrimination:   "It happened to them; therefore, it must have happened to me, too."   This court rejects such an argument.

It is well-established that this court may only consider evidence at the summary judgment stage that would be admissible at trial.   *See Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999) (collecting cases).   The cases of Humphrey, Buck, and Hughes are not probative evidence concerning the issue of whether Saunders and the Board intentionally discriminated against <u>plaintiff</u> because of her race, religion, or gender.   Rather, the probative value of such evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

---

[35] *See* Judy S. Buck v. Huntsville City Board of Education *et al.*, Civil Action No. CV-96-C-2881-NE (complaint filed on November 4, 1996, and stipulation of dismissal approved and ordered on July 30, 1999).   Before commencing her own lawsuit, Buck attempted to intervene as a party-plaintiff in the present action. *See* Doc. No. 53.   This court denied that motion on October 28, 1996.

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. *See Reed v. National Linen Service*, 182 F.3d 918 (6th Cir. 1999) (table) (text in Westlaw, 1999 WL 407463, at *7) ("Trial courts regularly prohibit 'me too' evidence from or about other employees who claim discriminatory treatment because it is highly prejudicial, but only slightly relevant."); *McLaughlin v. Essette Pendaflex Corporation*, 50 F.3d 507, 512 (8th Cir. 1995) (noting that plaintiff failed to demonstrate discriminatory bias by presenting supportive witnesses who had no involvement in decision-making process); *Sorenson v. City of Aurora*, 984 F.2d 349, 354-55 (10th Cir. 1993) (upholding trial court's decision to exclude evidence indicating that other female employees complained of discrimination and retaliation, because that evidence was irrelevant and confusing); *Haskell v. Kaman Corporation*, 743 F.2d 113, 121-22 (2d Cir. 1984) (noting that testimony of former company officers who were terminated was substantially outweighed by danger of unfair prejudice); *Yellow Bayou Plantation, Inc. v. Shell Chemical, Inc.*, 491 F.2d 1239, 1242-43 (5th Cir. 1974) (upholding trial court's discretionary decision to exclude evidence of prior employment discrimination lawsuit commenced against defendant, because of high potential for

unfair prejudice).

Consideration of those anecdotal case studies in the context of plaintiff's individual claim of disparate treatment would place an undue burden on defendants, who would either be forced to defend each situation, *i.e.*, try four separate employment discrimination lawsuits within plaintiff's lawsuit, or leave the testimony of Humphrey, Buck, and Hughes unrebutted.  Under either approach, the prejudice accruing to defendants considerably overshadows any relevance to plaintiff's case.  In addition, that type of evidence promises to cloud dispositive issues, confuse the jury, and prolong trial proceedings for an unreasonable time.

This court's role is not that of micro-managing the decision-making processes of Saunders and the Board.  *See Elrod v. Sears, Roebuck & Company*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Mechnig v. Sears, Roebuck & Company*, 864 F.2d 1359, 1365 (7th Cir. 1988) (other citations omitted)).  Rather, it is to ensure that those processes are conducted without reference to considerations of race, religion, or gender.  To resolve that question, therefore, it is imperative that this court compare plaintiff's treatment by

37

Saunders and the Board with their treatment of similarly-situated individuals *outside* of plaintiff's protected classes.   The court does so *infra* in Section III.C.1.b.iii.(a).   Anecdotal evidence concerning the predicaments faced by individuals who possess the same protected characteristics as plaintiff, on the other hand, does not aid the court in analyzing her own claim of disparate treatment.

### b.   Circumstantial evidence

Courts within this circuit "evaluate Title VII and 42 U.S.C. § 1983 race[, religion, or gender] discrimination claims supported by circumstantial evidence using the framework set out by the United States Supreme Court in *McDonnell Douglas Corp.*"   *Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1082-83 (11th Cir. 1996) (citing *Busby v. City of Orlando*, 931 F.2d 764, 777 (11th Cir. 1991)).   Use of circumstantial evidence is "[t]he distinct method of proof in employment discrimination cases, relying on presumptions and shifting burdens of articulation and production."   *Sheridan v. E.I. DuPont de NeMours & Company*, 100 F.3d 1061, 1071 (3d Cir. 1996) (*en banc*).

Under that now familiar analytical framework, plaintiff has the initial burden of establishing a *prima facie* case of

discrimination.  If successful, the burden of production shifts to defendant, who must articulate a legitimate, nondiscriminatory reason for the challenged employment action.  If that burden is met, plaintiff must produce evidence indicating that defendant's stated reason is mere pretext for unlawful discrimination.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that a plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)), *cert. denied sub nom.*, *Combs v. Meadowcraft Company*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Plaintiff carries the ultimate burden of showing that the defendant intentionally discriminated against her.  *See Wright*, 187 F.3d at 1292 ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.").

### i.  *prima facie* case

To establish a *prima facie* case of discrimination based upon her race, religion, or gender, plaintiff must prove four facts:

first, that she was a member of a protected class; second, that she was qualified for the position she held; third, that she suffered an adverse employment action; and fourth, that she was replaced by someone not a member of her protected class. *See generally McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

As to the first element, plaintiff — a female of Haitian origin with at least partial African heritage, and, an adherent to the principles of the Bahái faith — is a member of at least three protected classes.[36]

Defendants do not dispute the second element of a *prima facie case* — that plaintiff was qualified to hold the position of Principal on the dates of her suspension and transfer.[37]

---

[36] The parties apparently concede that plaintiff has properly instituted a <u>race</u> claim under Title VII, as opposed to a color or national origin claim. *See* I Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 343 (3d ed. 1996) ("Although color often has been treated as a classification synonymous with race, race and color are distinct concepts."); *id.* at 351 ("The distinctions between national origin, citizenship, immigration status, and race sometimes are elusive."). While plaintiff's self-description as a "Black Haitian Mulatto" with "part of [her] heritage ... [being] white" seems to strike at the gamut of these protected characteristics, the court will treat her claim as one based on race discrimination.

[37] Defendants state in brief that plaintiff "can make a prima facie case because she is a Black female who was transferred from her position. Although defendants dispute that this was a tangible adverse employment action, because Ebrahimi lost no pay or benefits in the transfer, for purposes of this argument, Defendants assume that Ebrahimi has made a prima facie case of discrimination." Doc. No. 94, at 26.

In view of the faculty-staff revolution that erupted at McDonnell, defendants' concession of plaintiff's qualifications appears at least quizzical. It would seem that one of the most important attributes of an administrator is that of effectively managing people. Nevertheless, this court assumes for purposes of this motion that plaintiff has demonstrated qualification for the

Despite defendants' argument to the contrary, this court finds that plaintiff has satisfied the third element of a *prima facie* case:  demonstrating that her suspension and subsequent transfer amounted to an adverse employment action.   A number of federal statutes, including Title VII, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), forbid discrimination in the workplace on the basis of suspect classifications; indeed, those statutes proscribe "a broad variety of adverse employment actions, whenever those actions are taken for a prohibited reason." *McNely v. Ocala Star-Banner Corporation*, 99 F.3d 1068, 1077 (11th Cir. 1996) (ADA case).  The Eleventh Circuit has indicated that a district court's analysis of whether a contested employment action was sufficiently "adverse" to implicate federal statutory protections should take into account conclusions reached with respect to other relevant employment discrimination laws.   *See Doe v. DeKalb County School District*, 145 F.3d 1441, 1448 (11th Cir. 1998) (an ADA case observing that Eleventh Circuit "precedents interpreting these employment discrimination laws have often relied on the same 'adverse employment action' concept that

---

position from which she was removed by defendants.

41

is an essential element of a *prima facie* ADA case"). *Cf. Smith v. Alabama Department of Public Safety*, 64 F. Supp. 2d 1215, 1221 (M.D. Ala. 1999) (applying adverse employment action analysis from *Doe* to action brought under Title VII).

In *Doe*, the Eleventh Circuit clarified the analysis that must be undertaken to determine whether a contested employment decision is sufficiently adverse to warrant scrutiny under federal employment discrimination laws.  The narrow issue before the *Doe* court was whether the plaintiff's subjective belief that a transfer was disadvantageous was sufficient proof of "adversity."  The *Doe* court concluded it was not, and committed the adverse employment action analysis to an objective standard:

> Having determined that we are not bound to a subjective standard, we adopt an objective test:  An ADA plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse.  In our view, this test best reflects our employment discrimination doctrine and precedents.
>
> . . .
>
> As in the Eleventh Circuit, all of the cases that have found a transfer to be adverse appear to have based their conclusions on objective factors. ... In other words, our sister circuits have only held transfers to be adverse where the transfers were objectively equivalent, at least to some degree, to demotions.

*Doe*, 145 F.3d at 1448-49, 1450 (reiterating that weight of

authority leads to conclusion that "purely lateral" transfers do not constitute adverse employment actions). *See also Smith*, 64 F. Supp. 2d at 1221-22 (finding that Title VII plaintiff could not establish adverse employment action, because he suffered no loss in pay, benefits, or classification, only great embarrassment).

Applying the *Doe* test, and viewing the facts in a light most favorable to plaintiff, this court concludes that a reasonable person in her position would have viewed the involuntary transfer from the position of Principal to that of a Curriculum Technologist in the central office as an adverse employment action, *i.e.*, a demotion. As stated in Section II.C *supra*, plaintiff claims the Curriculum Technologist position was devoid of responsibility. *Cf. McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir. 1994) (plaintiff established "adverse employment action" in § 1983 case premised on alleged deprivations of the First Amendment where she demonstrated that, among other things, position to which she was transferred involved "less responsibility and more menial tasks than her old job"). Further, she claims she lost status and prestige upon removal from her principalship.

Accordingly, the dispositive issue regarding plaintiff's establishment of a *prima facie* case focuses on whether she has

43

adduced evidence indicating that the Board replaced her at McDonnell with an individual outside each of her three protected classes.

Nell Skidmore, a white female, replaced plaintiff on an interim basis at McDonnell. Linda Winters, another white female, eventually assumed the McDonnell principalship on a permanent basis. Clearly, therefore, plaintiff has made out a *prima facie* case of <u>race</u> discrimination. This court further assumes that both Skidmore and Winters were not members of the Bahái faith, which leads to the conclusion that plaintiff has stated a *prima facie* case of <u>religious</u> discrimination. What plaintiff has failed to make out, however, is a *prima facie* case of <u>gender</u> discrimination. She was not replaced by a male at McDonnell. Further, the weight of plaintiff's evidence regarding disparate treatment focuses on race and religion, not her gender. *See infra* Section III.C.1.b.iii. Accordingly, plaintiff's gender discrimination claims are due to be dismissed.

### ii. legitimate, non-discriminatory reasons

Defendants' legitimate, non-discriminatory reasons for suspending and transferring plaintiff are summarized in the minutes of the Board's February 3, 1994 meeting, during which the Board

44

approved the Superintendent's recommendation to transfer plaintiff

to the school system's central office:

> While Mrs. Ebrahimi has achieved many positive results for McDonnell Elementary School[,] such as increased business partnerships, increased PTA involvement, and initiating and supporting innovative teaching practices[,] her leadership and management style has created an unpleasant work environment, low morale, and lack of unity among McDonnell teachers and has adversely affected the teaching and learning environment. In fact, many of those who work closely with her believe her leadership and management style has created a climate of intimidation and fear. These circumstances exist in large measure because:
>
> > 1. Mrs. Ebrahimi has had conflicts with several of the McDonnell teachers and has attacked their integrity and credibility;
> >
> > 2. She has chastised and reprimanded teachers in inappropriate ways as well as in the presence of other teachers or students;
> >
> > 3. During evaluation of teachers, she has talked negatively about other teachers;
> >
> > 4. She has reacted inappropriately to allegations without getting the facts;
> >
> > 5. She has responded to issues raised by teachers with harshness, anger, and outbursts of temper or with an accusing manner; and,
> >
> > 6. She has engaged in inconsistent treatment of teachers and favoritism toward some staff members.
>
> In order to reestablish and maintain a positive teaching and learning environment at McDonnell Elementary School, as well as to take advantage of Mrs. Ebrahimi's expertise and knowledge in curriculum, it is necessary to transfer

her to a new position. [38]

Clearly, those reasons satisfy the Board's intermediate burden of production.   Accordingly, the court moves to a discussion of plaintiff's evidence of pretext.

### iii. pretext

Plaintiff advances two general lines of argument in support of her contention that defendants' stated reasons for their contested employment actions are not worthy of belief.   First, she claims that Saunders and the Board received similar complaints about principals outside of plaintiff's protected classes, but did not suspend or transfer them.   Second, she argues that Saunders and the Board were on notice that sociocultural differences of race and religion motivated the staff members who complained about her.   She places special emphasis on the fact that Saunders voiced his personal opinion to that effect during his first meeting with her following the initial complaint.   In essence, plaintiff contends that Saunders and the Board condoned and ratified racial and religious discrimination by ultimately siding with the complaining McDonnell staff, and that such condonation and ratification violates Title VII.   For the reasons set forth below, the court

---

[38] Exhibit G-1 to transcript of plaintiff's March 24, 1994 transfer hearing.

rejects both of these arguments, and concludes that plaintiff has failed to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs*, 106 F.3d at 1528.

### (a)   "comparables" evidence

Plaintiff alludes to a number of situations in which white principals within the school system had been criticized by parents and staff members, but were not involuntarily transferred.[39]   She places heavy emphasis on the case studies of Deborah Baker, the white female Principal of Chapman Elementary School, Norm Sharp, the white male Principal of University Place, and Sam Sullins, the white male Principal of Huntsville Middle School.[40]

---

[39] As noted *supra* in Section III.C.1.a.i, plaintiff's evidence relating to Saunders' (and the Board's) treatment of other black female principals and candidates for principalships would not be admissible at trial, based on Federal Rule of Evidence 403. That "me too" evidence is wholly different from evidence offered to compare plaintiff's treatment to that of similarly-situated individuals outside of her protected classes, however. *See* I Barbara Lindemann & Paul Grossman, Employment Discrimination Law 30-31 (3d ed. 1996) ("In most cases the key to proving pretext is comparative evidence. The plaintiff may show pretext for discrimination with evidence that similarly situated employees outside of the plaintiff's protected group received favored treatment or did not receive the same adverse treatment.") (footnotes omitted).   Because that "comparative" evidence would certainly be admissible at trial to demonstrate disparate treatment, the court considers it here.

[40] Plaintiff also references incidents involving Principals Earline Pinckney (white female), Jo Farrow (white female), Penny Sumners (white female), Cecilia Bruton (white female), Carolyn Burgoyne (white female), Linda Winters (white female), and others as evidence that she was treated differently because

A number of faculty members complained to Saunders about Baker, asserting that she was intimidating, belittling, vindictive, and apt to play favorites.  Assistant Superintendent Yates even told plaintiff that the situation Baker confronted was similar to the one plaintiff faced at McDonnell.  Saunders met with Baker and encouraged her to work out the problems with her staff herself.  In contrast to plaintiff, Baker succeeded in doing so.  Plaintiff thus has failed to demonstrate a disparity in the manner Saunders handled the complaints against her, as compared to the way he proposed a resolution to the complaints lodged against Baker. Plaintiff and Baker were given the same opportunity by Saunders — to work out the problems with the complaining staff members on their own.  Baker was successful in resolving the conflict informally, while plaintiff was not.

Norm Sharp was accused by teachers of poor leadership, favoritism, and the creation of low morale at his school.  Caylor, Saunders' predecessor, had suspended Sharp for locking students out

---

of her race and/or religion.  The predicaments those principals faced were markedly differently from the extreme tension and conflict that existed at McDonnell, however.  Accordingly, reference to those incidents is not probative evidence on the issue of whether Saunders and the Board unlawfully discriminated against plaintiff.  See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (for employees to be considered "similarly situated," "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways").

of his school.   Sharp not only sexually harassed certain faculty and staff members, he also allowed employees to drink alcohol on school grounds.      Shortly   after   assuming   the   position   of Superintendent, Saunders met with Sharp to inform him that he would recommend to the Board that it terminate his employment.   Saunders based   that   recommendation   on   discussions   with   the   prior Superintendent and the Board's attorney, as well as the results of a survey submitted to teachers at Sharp's school.   Sharp, on the advice of his own attorney, offered to transfer to the central office and perform administrative work for the remainder of the school year (a period of four months), and then to resign, to avoid suffering the indignity of termination.   Despite having grounds for termination, Saunders accepted Sharp's proposal.   Unlike plaintiff, Sharp had committed a number of offenses that qualified as grounds for termination.   Defendants, in their reply brief, "concede that Sharp was worse [than plaintiff]."[41]   Saunders, however, never told plaintiff that she would be terminated based on the situation at McDonnell.   Rather, Saunders desired to retain her as a school system employee, just not as the Principal of McDonnell.   To that end, Saunders and the Board ultimately transferred plaintiff to the central office, with the expectation that she would remain there

---

[41] Doc. No. 108, at 17.

and contribute positively.  The same cannot be said of Sharp.
While he procured a transfer for a short period of time and avoided
termination through a resignation tender, Saunders made clear to
him that under no circumstances would he be retained as a school
system employee beyond the end of that school term.

Sam Sullins' management techniques also were criticized by the
teachers he supervised, who accused him of being punitive and
retaliatory.  Saunders discussed those complaints with Sullins, and
eventually concluded that he should be removed as Principal.
Similar to plaintiff's case, Saunders presented Sullins with
options:  he could either return to the classroom and teach
science, or he could assume a night administrator position at the
school system's Center For Technology.  After talking with Saunders
on several occasions, Sullins begrudgingly accepted the night
administrator position.  This court detects no difference in
Saunders' treatment of Sullins and plaintiff.  In each case,
certain staff members criticized the respective principal's
leadership style and management skills.  Once Saunders became
convinced that removal of each principal was in the best interests
of the school system, he presented them with certain options for
continued employment within the school system.  Saunders stated in
deposition that, had Sullins not agreed to accept transfer to the

night administrator position, he would have recommended to the Board that Sullins be involuntarily transferred.  This is exactly what happened in plaintiff's case.  The only difference is that Sullins accepted one of Saunders' offers before Board involvement.

Plaintiff's attempt at showing that she was treated differently by Saunders and the Board when compared to those white principal comparators thus fails.  In sum, a reasonable fact finder would not be able to infer discrimination based on race or religion from plaintiff's "comparative" evidence.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (for employees to be considered "similarly situated," "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways").

### (b)   "condonation & ratification" evidence

Plaintiff's pursuit of a condonation/ratification theory of disparate treatment against Saunders, Yates, and the Board members also is an ineffective defense to summary judgment.  In essence, plaintiff requests this court to make a double inferential leap. First, this court must infer that certain staff members at McDonnell were motivated, at least in part, by a racial or religious animus when lodging their complaints about plaintiff with

51

Saunders.   Viewing the facts in a light most favorable to plaintiff, this court concludes that a jury might infer a degree of racial and religious bias on the part of some complaining staff members.

Second, by observing that Saunders, Yates, and the Board members were placed on notice by plaintiff and her supporters that race and religion likely played a role in the staff members' complaints, plaintiff requests this court to infer that the same discriminatory animus also motivated the actions of those decision-makers.[42]   The evidence in this case does not permit such a quantum inferential leap.

It is undisputed that the Board was the ultimate decision-maker in terms of deciding plaintiff's fate at McDonnell.   It also

---

[42] Plaintiff restated this argument in her deposition, saying:

> Q.   Any other -- let me go back to my question initially. Did Dr. Saunders ever say anything to you that you thought was -- that you took to be discriminatory on the basis of race, sex or religion?
>
> A.   Except for the things I told you he shared.
>
> Q.   You thought he was being discriminatory by sharing with you --
>
> A.   I think his actions in the end reflect or represent[] the beliefs of the community, the school community. Because if he didn't believe in it then he shouldn't have acted on it.  So your behavior reflects who you are and what you believe and what you think.  Deep down I don't believe he's a racist, but he acted or allowed racist situations to take place.

Plaintiff's deposition (Volume I) at 200.

is undisputed that the Board had no authority to act in the absence
of a recommendation from Saunders.   For Title VII purposes,
therefore, Saunders' and Yates' roles as integral parts of the
decision-making process may be imputed to the Board in ascertaining
a discriminatory animus for purposes of Title VII.   *See Schoenfeld
v. Babbit*, 168 F.3d 1257, 1268 (11th Cir. 1999).

Plaintiff cannot pinpoint any racially or religiously charged
statement by Saunders, Yates, or the Board members in the context
of her suspension and transfer.   While Board member James Dawson —
himself a person of African-American heritage and a former
president of the Huntsville chapter of the National Association for
the Advancement of Colored People — stated in general terms that
the school system was rampant with racism,[43] he specifically
disclaimed any considerations of race or religion when supporting
Saunders' recommendations to suspend and transfer plaintiff.

Plaintiff places a great deal of emphasis on a statement made
by Saunders during his first meeting with her to discuss the

---

[43] Dawson did not limit his claim of racism solely to Huntsville schools:

The school system.   That's not necessarily -- a school system
consists of everyone in the community, the parents, teachers,
students, the administration and et cetera.   That was just a broad
statement.   Now, racism in Huntsville is racism in the school system
in the United States.

Deposition of James Dawson, attached as Exhibit L to defendants' evidentiary
submission in support of summary judgment, at 37.

McDonnell staff complaints.[44]   That statement, however, did not reveal the inner workings of Saunders' mind on the crucial issue of whether considerations of race and religion would eventually factor into _his_ decision to recommend suspension and transfer to the Board.   On the contrary, Saunders was merely surmising the motives of some of the complaining staff members.[45]   The evidence clearly indicates that Saunders remained a staunch supporter of plaintiff until the bitter end, when finally he concluded that the situation at McDonnell was dire, and that either a large number of teachers or plaintiff had to be removed to resolve the conflict.   Moreover, Saunders' statement in affidavit that he recommended eight females with African-American heritage to principalships during his short tenure as Superintendent runs counter to plaintiff's theory that he exhibited a latent discriminatory animus.[46]

As to other decision-makers, plaintiff has not proffered sufficient evidence to permit a reasonable fact finder to infer

---

[44] _See supra_ § II.B.

[45] It is questionable whether the statement allegedly made by Saunders about the staff members (to the effect, "I think they think ...") would be admissible at trial, if he disclaims making such a statement. _Cf._ Fed. R. Evid. 803(3); H.R. Rep. No. 650, 93d Cong., 1st Sess. (1973) ("[T]he Committee intends that [Rule 803(3)] be construed ... so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person."), _reprinted in_ 1974 U.S.C.C.A.N. 7051, 7057, 7087; United States v. Cintolo, 818 F.2d 980, 1001 (1st Cir.), _cert. denied_, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

[46] _See_ Saunders affidavit ¶ 17.

race or religious discrimination.   Assistant Superintendent Yates was placed on notice of allegedly improper motives advanced by the concerned staff members, and also was informed of the allegation that plaintiff prayed to an image of Saddam Hussein.   Board member Martha Miller allegedly aligned herself with the teachers, because plaintiff reprimanded her friend, Judy Guin.   Board member Ann Fee expressed displeasure at being mentioned in the narrative of complaints logged by the teachers.   Dawson allegedly supported the teachers, because his wife was friends with many of them.   Board member Randy Bounds was "elusive" in responding to plaintiff when she asked him for support.   All Board members were put on notice that race and religion may have formed the basis of the staff members' complaints.   None of these points, however, link the decision-makers to a discriminatory animus made unlawful under Title VII or § 1983.[47]

Even viewing the facts in a light most favorable to plaintiff, the evidence reveals that the Board confronted an untenable situation at McDonnell.   The evidence that plaintiff's management

---

[47] Plaintiff also relies on the fact that the Huntsville City School System (like many other public school systems within the State of Alabama) still operates under a federal court desegregation order, as well as the results of a 1993 Curriculum Audit ordered by the Board.   That audit focused primarily on student inequities based on race, not racial inequities relating to administrators.   Plaintiff's reliance on the remnants of segregation and a Curriculum Audit that focused on student equality are misplaced in the context of her individual employment discrimination claim.

style created an unpleasant work environment at that school is overwhelming. The environment was not conducive to teaching or learning, and a substantial number of McDonnell teachers and staff had made unequivocally clear that they simply would not continue to work with plaintiff at the helm. That inescapable fact led Saunders, and ultimately the Board, to take action. Any racial or religious animosities that might be inferred from statements made by some of the complaining teachers simply cannot be related to the ultimate decisional process undertaken by Saunders, Yates, and the Board. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("Thus, stray remarks in the workplace ... cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements made by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard."); *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 270, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977) (holding that plaintiff failed to demonstrate that Village's Board of Trustees had racially discriminatory purpose in denying request

for rezoning, despite fact that members of community who opposed such rezoning "might have been motivated by opposition to minority groups"); *Eiland v. Trinity Hospital*, 150 F.3d 747, 751-52 (7th Cir. 1998) (rejecting plaintiff's attempts at imputing racial animus of co-worker to decision-maker).

The Eleventh Circuit's decision in *Harris v. Shelby County Board of Education*, 99 F.3d 1078 (11th Cir. 1996), illustrates what must be shown to create a jury issue on the question of pretext in this context. The plaintiff in that case, an African-American male, alleged race discrimination based on the Shelby County Board of Education's decision to hire a white male as Principal of Thompson High School. The district court granted summary judgment to the Board (as well as the Shelby County School Superintendent and certain Board members), because Harris failed to make a showing of pretext. The Eleventh Circuit reversed, and made the following relevant observations:

> In the Title VII context, the dispute revolves around Rogers' [the Superintendent's] intent. She was the decisionmaker responsible for making employment recommendations to the Board. The record establishes that the Board can act on a matter like this only upon the superintendent's recommendation.
>
> . . .
>
> Sumners' [the Personnel Director who sat on the same

> hiring committee as the Superintendent] testimony
> provides support for Harris' assertion that Rogers
> intentionally discriminated against him during the
> process of selecting a new principal for Thompson High
> School, a process Rogers substantially controlled. ...
> Sumners stated in his deposition that, when Rogers began
> serving as superintendent, she ordered him to cease
> efforts to recruit black candidates for positions with
> the Shelby County school system.  There was also evidence
> that Rogers transferred Harris out of Thompson High
> School in an attempt to reduce his chances of becoming
> principal there.   The strongest evidence of Rogers'
> racial motivation can be found in Rogers' statement, as
> reported by Sumners and quoted verbatim above, to the
> effect that "under the circumstances we did not need to
> employ a black at Thompson High School."  Although this
> statement may be open to more than one interpretation, a
> fact-finder could reasonably infer that Rogers meant that
> Harris would not be considered for the position because
> he is black.

*Id.* at 1083 n.3, 1084 (concluding "that there remain genuine issues of material fact with respect to Rogers' intent").[48]  In *Harris*, summary judgment was inappropriate because the plaintiff had presented compelling evidence that, if accepted by the fact-finder, directly linked a decision-maker to a discriminatory animus.   The same cannot be said in the case before this court.

---

[48] After concluding that genuine issues of material fact existed with respect to the issue of pretext, the Eleventh Circuit noted that plaintiff's remedies would nonetheless be limited pursuant to 42 U.S.C. § 2000e-5(g)(2)(B), even if he was able to show at trial that Rogers harbored a racially discriminatory animus, because overwhelming evidence indicated that Rogers would have made the same decision (to recommend a white male instead of plaintiff) in the absence of any discriminatory intent.  *See id.* at 1085 ("From the facts presented in this summary judgment record, it is clear that [the hired individual's] qualifications are sufficiently superior to those of Harris that no juror could conclude that Rogers would not have made the same decision absent discriminatory intent.").

In sum, plaintiff's disparate treatment claims under Title VII and § 1983 are due to be dismissed.  She has failed to make out a *prima facie* case of sex discrimination.  As to her claims of race and religious discrimination, she has failed to come forward with sufficient evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'"  *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston*, 37 F.3d at 605).

## 2.   Retaliation

Plaintiff contends she was subjected to unlawful retaliation after filing a charge of discrimination with the EEOC.  Such an assertion clearly states a claim under Title VII, which provides, in relevant part, that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Plaintiff's retaliation claim is not viable under § 1983, however.  "A pure or generic retaliation claim ... simply does not implicate the Equal Protection Clause."  *Watkins v. Bowden*, 105

59

F.3d 1344, 1354 (11th Cir. 1997) (collecting authorities, and noting that § 1983 retaliations claims are generally bottomed upon alleged deprivations of the First Amendment). Accordingly, any retaliation claim premised on § 1983 is due to be dismissed.

Before turning to an analysis of plaintiff's Title VII retaliation claim, the court notes that it also is subject to the burden-shifting framework discussed *supra* in Section III.C.1.b. As set forth in a recent opinion by the Eleventh Circuit:

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action. ... The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, No. 99-4371, 2000 WL 825672, at *5 (11th Cir. June 26, 2000) (citations omitted).

### a. *Prima facie* case

It is well-established under Eleventh Circuit law that plaintiff must prove three points in order to establish a *prima facie* case of retaliation: first, that she engaged in statutorily protected expression or activity; second, that she suffered an adverse employment action; and third, the existence of a causal

linkage between the protected conduct and the adverse action.  *See*

*Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir.

2000); *Farley v. Nationwide Mutual Insurance Company*, 197 F.3d

1322, 1336 (11th Cir. 1999); *Goldsmith v. City of Atmore*, 996 F.2d

1155, 1163 (11th Cir. 1993).  To establish the requisite causal

connection, "a plaintiff need only establish that 'the protected

activity and the adverse action were not wholly unrelated.'"

*Goldsmith*, 996 F.2d at 1163 (citations omitted).

Defendants do not (nor could they) dispute that plaintiff

participated in protected activity by filing an EEOC charge.  In

*Gupta*, the Eleventh Circuit reiterated that the question of whether

an employment action is sufficiently "adverse" to warrant scrutiny

under Title VII's anti-retaliation provision must be analyzed under

both an objective and subjective standard:

> An adverse employment action is an ultimate employment
> decision, such as discharge or failure to hire, or other
> conduct that "alters the employee's compensation, terms,
> conditions, or privileges of employment, deprives him or
> her of employment opportunities, or adversely affects his
> or her status as an employee." ... Conduct that falls
> short of an ultimate employment decision must meet "some
> threshold level of substantiality ... to be cognizable
> under the anti-retaliation clause." ... In evaluating
> what actions meet that required level of substantiality,
> we recognize that "Title VII[] is neither a 'general
> civility code' nor a statute making actionable the
> 'ordinary tribulations of the workplace.'" ... Whether an
> action is sufficient to constitute an adverse employment

61

> action for purposes of a retaliation claim must be
> determined on a case-by-case basis, ... using both a
> subjective and objective standard, see Doe v. Dekalb
> County School Dist., 145 F.3d 1441, 1448-49 (11th Cir.
> 1998) (recognizing that the subjective requirement is
> virtually almost always satisfied and imposing an
> objective requirement, as well).

Gupta, 212 F.3d at 587 (other citations omitted).

As discussed in Section II.C supra, plaintiff alleges numerous incidents of retaliatory conduct after filing her EEOC charge.[49] Some (but clearly not all) of those claims rise to the level of "adverse" employment actions. Specifically, plaintiff was rejected for numerous principalships (Hampton Cove, Colonial Hills, Highlands, and Ridgecrest), as well as other administrative positions that she coveted more than her Curriculum Technologist position (Manager of Elementary Education, K-12 Curriculum Director, Director of Federal Programs, Director of Technology, and Director of Program Assessment and Research).[50] The Board's failure

---

[49] Plaintiff also contends Saunders' failure to make good on his promise to award her certain positions, if she agreed to voluntarily transfer to the central office, was retaliatory, based on the fact that she opted not to voluntarily transfer. This court agrees with plaintiff, and analyzes whether those employment decisions were sufficiently "adverse" to implicate Title VII's anti-retaliation provision.

[50] This court does not deem plaintiff's failure to receive the Director of Research and Development position as an adverse employment action, because the position was graded at a lower level. The court assumes arguendo that the positions of Manager of Elementary Education, Director of Federal Programs, Director of Technology, and Director of Program Assessment and Research were graded on a level equivalent or higher to that possessed by plaintiff as Principal, and then Curriculum Technologist.

to hire plaintiff into any of those positions after she filed an EEOC charge establishes a *prima facie* case of retaliation. Additionally, the reprimands plaintiff received from Hershberger (relating to plaintiff's request to attend an internet conference) and Saunders (relating to plaintiff's alleged breach of student testing security), from an objective standpoint, are sufficiently adverse employment actions to warrant scrutiny under the anti-retaliation provision. *Cf. McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (noting that, for purposes of § 1983, "'adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands").

The remainder of plaintiff's allegations of retaliation, however, fall within a "gray area" noted by the Eleventh Circuit in *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998): "Although we do not doubt that there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause, we need not determine in this case the exact notch into which the bar should be placed." *Id.* at 1456. Even so, the *Wideman* court went on to note "that the actions about which Wideman complain[ed] considered <u>collectively</u>

63

[were] sufficient to constitute prohibited discrimination." *Id.* (emphasis supplied) (actions included being improperly listed as a "no-show" for work, being required to work without a lunch break, being reprimanded and suspended, being the subject of negative criticism, being told to report to work and subsequently being informed she was not scheduled to work, being verbally threatened by a supervisor, and suffering delay in treatment for an allergic reaction).

Plaintiff's affidavit describes at least twenty discrete incidents of allegedly retaliatory action. Defendants have not endeavored to systematically refute each allegation. Rather, they have asserted in a conclusory manner that such complaints do not amount to an adverse employment action. That argument flies in the face of *Wideman*, however, which instructs district courts to view allegedly retaliatory actions not only individually, but also collectively.[51]

---

[51] The court has considered the Eleventh Circuit's disposition of plaintiff's retaliation claims in *Gupta*, and concludes that the allegations here are distinguishable, and thus constitute an adverse employment action when viewed collectively. *See Gupta*, 212 F.3d at 587-90 (considering plaintiff's allegations of retaliation individually and collectively pursuant to *Wideman*, and deeming five of seven retaliatory incidents not adverse enough to warrant scrutiny under Title VII). As to several of the incidents complained of by the plaintiff in *Gupta*, the Eleventh Circuit pointed to evidence indicating that such incidents had no effect whatsoever on plaintiff's employment situation. *See id.* at 588 ("An action which, it turns out, had no effect on an employee is not an 'adverse' action."). In this case, defendants have pointed to no evidence suggesting that plaintiff suffered no adverse consequences in the terms, conditions, or

This court concludes that the totality of the remaining allegations of discrimination are sufficient to implicate Title VII.  Those claims, if believed by the fact-finder, demonstrate not only that plaintiff was not permitted to take on additional tasks that she felt would be beneficial to the school system, but also that she was not allowed to fulfill the basic duties of her job description.  At bottom, plaintiff contends she was transferred to a job devoid of responsibility, and that a retaliatory motive permeated many decisions subsequent to the transfer.   If plaintiff's version of events is believed, those decisions ensured that, despite her efforts to the contrary, plaintiff would not be allowed to assume any responsibility for the improvement of the school system in her capacity as Curriculum Technologist.   Taken collectively, therefore, the retaliatory actions plaintiff perceived while she served as a Curriculum Technologist amount to an adverse employment action.

### b.   Legitimate, non-discriminatory reasons

Defendants contend that none of the actions taken toward plaintiff subsequent to the filing of her EEOC charge were retaliatory in nature.   As to the Board's failure to place

---

privileges of her employment as a result of the aforementioned retaliatory conduct.

plaintiff into one of the open principalships for which she applied, defendants indicate in <u>brief</u> that plaintiff simply was not the best-qualified candidate.  They note that Charlie Pike, who assumed the principalship at Hampton Cove, "had twenty years of experience as an assistant principal and also has experience as an acting principal."[52]  As to the numerous complaints plaintiff lodged regarding her treatment by her supervisor, Hershberger, and Assistant Superintendent Yates, defendants' position is best summarized by Superintendent Saunders' response to the internal grievance filed by plaintiff:

> As a final note, I must add that I want to work
> cooperatively with you, as do Dr. Yates and Mrs.
> Hershberger.  But, your obvious anger makes cooperative
> working arrangements more difficult.  My request is that
> you try to work cooperatively with us as we continue to
> try to work cooperatively with you. ... Despite the fact
> that several reprimands were given out, you continue to
> assert that the whole thing was directed at you because
> of your lawsuit.  I ask that you consider the possibility
> that I am simply trying to do my job as are Dr. Yates and

---

[52] Doc. No. 108, at 19.  This point is challenged by plaintiff, who stated in deposition that Pike had little or no experience with elementary-age children. *See* Plaintiff's deposition (Volume II) at 168.

Plaintiff's contention, offered in her surreply brief, that defendants have not proffered sufficient <u>evidence</u> to warrant a grant of summary judgment on her claim of retaliation is well-taken.  *See* Doc. No. 109, at 15-16 & n.9.  In fact, defendants have offered little in the way of evidence to explain why plaintiff was not offered the various principalships she applied for once she assumed her Curriculum Technologist position.  Nonetheless, plaintiff has not moved for summary judgment on her retaliation claim, so defendants' failure to articulate legitimate, non-discriminatory reasons for certain allegedly retaliatory actions does not compel this court to find for plaintiff on the issue of liability.

Mrs. Hershberger.[53]

In essence, defendants contend that plaintiff's own attitude created the post-transfer difficulties she has documented.[54]

### c.    Pretext

Viewing the facts in a light most favorable to plaintiff, the court finds that genuine issues of material fact exist regarding whether the Board, by and through its own actions as well as the actions of its supervisory employees, unlawfully retaliated against plaintiff. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination."). Accordingly, summary judgment on plaintiff's Title VII retaliation claim is due to be denied.

---

[53] Exhibit R to plaintiff's affidavit.

[54] Defendants further argue that the Board should not be held responsible for the retaliatory actions taken by Booker and Hershberger, plaintiff's supervisors in the central office. *See* Doc. No. 108, at 20. That contention is without merit. *See Wideman*, 141 F.3d at 1455 (imputing liability to employer for retaliatory actions taken by plaintiff's manager and two assistant managers). Moreover, plaintiff stated in deposition that a colleague overheard Board member Ann Fee comment that she "had the nerve of suing teachers ... [and] had no right to do that." *See* Plaintiff's deposition (Volume II) at 162.

### 3.   Hostile Work Environment

The Supreme Court concluded, in *Meritor Savings Bank v.
Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), that
"[t]he phrase 'terms, conditions, or privileges of employment' [in
42 U.S.C. § 2000e-2(a)(1)] evinces a congressional intent 'to
strike at the entire spectrum of disparate treatment of men and
women' in employment." *Id.* at 64, 106 S.Ct. at 2404 (quoting *Los
Angeles Department of Water and Power vs. Manhart*, 435 U.S. 702,
707, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978)).   Encompassed
within that "spectrum" is the right of individuals to work in an
environment that is not discriminatorily hostile or abusive. *See
Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367,
370, 126 L.Ed.2d 295 (1993).   According to the *Harris* court: "When
the workplace is permeated with 'discriminatory intimidation,
ridicule, and insult,' that is 'sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an
abusive working environment,' Title VII is violated." *Id.* (quoting
*Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2405) (internal
citations omitted).[55]

---

[55] The Supreme Court reiterated in *Harris* that Title VII liability for a
hostile work environment "takes a middle path between making actionable any
conduct that is merely offensive and requiring the conduct to cause a tangible
psychological injury."  *Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

The Eleventh Circuit summarized the elements of a Title VII hostile work environment claim in *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (*en banc*), saying that a plaintiff must demonstrate

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome ... harassment; (3) that the harassment must have been based on the [protected characteristics] of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Id.* at 1245 (11th Cir. 1999) (*en banc*).[56] With regard to the fourth element, a plaintiff must show not only that she subjectively perceived her work environment to be hostile, but also that the conduct creating this environment was sufficiently severe or pervasive to make her perception objectively reasonable.

Conduct that is not severe or pervasive enough to create

---

[56] As to plaintiff's § 1983 claim, she must satisfy the following elements to establish a hostile work environment for purposes of the Fourteenth Amendment equal protection clause:

> In order to prevail on her hostile work environment sexual and racial harassment claim under the Equal Protection Clause, [plaintiff] has to show that (1) she belonged to the protected groups at issue; (2) she was subjected to unwelcome sexual and racial harassment; (3) the harassment was based upon gender and race; (4) the harassment affected the conditions of her employment; (5) the defendant ... acted under color of state law; and (6) the defendant acted with discriminatory purpose or intent.

Watkins v. Bowden, 105 F.3d 1344, 1355 (11th Cir. 1997). Since the "under color of state law" element is not contested, this court employs the Title VII framework for harassment claims to resolve plaintiff's § 1983 claims as well.

> an objectively hostile or abusive work environment—an
> environment that a reasonable person would find hostile
> or abusive—is beyond Title VII's purview.  Likewise, if
> the victim does not subjectively perceive the environment
> to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no
> Title VII violation.

*Harris*, 510 U.S. at 21-22, 114 S.Ct. at 370.  *See also Mendoza*, 195

F.3d at 1246 (noting that employment of objective component

"delineate[s] a minimum level of severity or pervasiveness

necessary for harassing conduct to constitute discrimination in

violation of Title VII").  The *Harris* Court sketched a short list

of factors, none of which are dispositive, that aid in determining

whether a work environment is "hostile":

> These may include the frequency of the discriminatory
> conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive
> utterance, and whether it unreasonably interferes with an
> employee's work performance.

*Id*. at 23, 114 S.Ct. at 371 (concluding that whether a work

environment is hostile depends on an analysis of "all the

circumstances").

Plaintiff's allegations of a hostile work environment both

before and after her transfer from McDonnell fail to survive

summary judgment, because she cannot satisfy the third requirement

set forth by the Eleventh Circuit in *Mendoza*.  Overt, repeated

demonstrations of a discriminatory animus based on race, religion, or sex have not been shown by plaintiff.[57]   In the hostile work environment context, harassment based on a protected characteristic may not be inferred.   Because plaintiff has not proffered adequate evidence showing that her work environment was ever permeated with "discriminatory intimidation, ridicule, and insult," her hostile work environment claims arising under Title VII and § 1983 are due to be dismissed.[58]   *Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2405 (emphasis supplied).   *See also Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) (affirming trial

---

[57] In her response and surreply brief, plaintiff does not argue that her evidence demonstrates the existence of a retaliatory hostile work environment. Rather, she pursues her harassment claims on the basis of her race, religion, and sex. *See* Doc. No. 100, at 87-88 (the court construes plaintiff's argument that Saunders continued to discriminate against her after the transfer as an accusation that he continued to harbor a discriminatory animus on the basis of race, religion, and sex); Doc. No. 109, at 10-13; *see also* Doc. No. 112 (supplemental surreply brief, at 1-2).

Accordingly, this court does not explore a theory of retaliatory hostile work environment, even though it has been recognized by certain courts. *See generally, e.g.*, Jones v. WDAS FM/AM Radio Stations, 74 F. Supp. 2d 455 (E.D. Pa. 1999); Fleming v. South Carolina Department of Corrections, 952 F. Supp. 283 (D.S.C. 1996). The court notes marginally, however, that its denial of summary judgment on plaintiff's retaliation claim, and treatment of her various post-transfer complaints as adverse employment actions, would alleviate any need to pursue a claim based on a retaliatory hostile work environment. *See Fleming*, 952 F. Supp. at 290 ("In this case, the plaintiff alleges a retaliatory hostile work environment: the specific actions she complains of were not sufficient to qualify as adverse employment actions, but they were sufficient to alter the conditions of her work environment.").

[58] With respect to the few overt instances of discrimination described by plaintiff and her supporters (all occurring before she was transferred from McDonnell), she has failed to show that such incidents were sufficiently severe or pervasive to create a racially or religiously hostile work environment from an objective standpoint.

court's grant of summary judgment on plaintiff's hostile work environment claim under circumstances similar to those here); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990) (for a hostile work environment to be established, racial slurs spoken by co-workers must be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility").

**D.   § 1983 Claims Against Individual Defendants**

"A government actor ... cannot violate a plaintiff's equal protection rights unless the defendant has the intent to discriminate." *Mencer v. Hammonds*, 134 F.3d 1066, 1070 (11th Cir. 1998). As discussed *supra* in Section III.C.1.b.iii, plaintiff has failed to offer sufficient evidence for a jury to infer that any of the individually-named defendants — Miller, Fee, Bounds, Dawson, Saunders, or Yates — intended to discriminate against her on the basis of race, sex, or religion when deciding that it was in the school system's best interest to suspend her with pay and then transfer her to the central office. Accordingly, plaintiff's § 1983 claims against those defendants are due to be dismissed.

### IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be granted in part and denied in part.

Plaintiff's Title VII-based retaliation claim against the Board alone survives summary judgment.  All other claims are due to be dismissed.  An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this __7th__ day of August, 2000.

_____
United States District Judge

73